**Raymond J. DONOVAN, Secretary of Labor, United States Department of Labor, Plaintiff,**

v.

**LOCAL 41, INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN AND HELPERS OF AMERICA, Defendant.**

**No. 82–0632–CV–W–3.**

United States District Court, W.D. Missouri, W.D.

Nov. 28, 1984.

---

A. Mary Sterling, Asst. U.S. Atty., Kansas City, Mo., for plaintiff.

Michael Gordon, Kansas City, Mo., for defendant.

OPINION AND ORDER

ELMO B. HUNTER, Senior District Judge.

This matter comes before the Court for disposition following a full trial to the Court. The Secretary of labor challenges a 1981 election run by defendant, Local 41, claiming that a determinative number of members were denied a reasonable opportunity to vote. The basis of the Secretary's challenge is that the only polling place used in the election was in Kansas City, Missouri, while the union's membership covers a broad geographic area. No mailed ballots were made available for use by the membership.

This action began when Dale Holland and Paul Spicer, members in good standing of Local 41 and unsuccessful candidates in the 1981 election, protested the election because there were "some members that could not vote because of the distance in which they live—some in Springfield, Missouri, Sedalia, Missouri, Iola, Kansas, and Wichita, Kansas—plus the Schneider people."

Local 41 is a labor organization with its principal office located in Kansas City, Missouri. From December 9 to 13, 1981, Local 41 held an election of officers for the positions of president, vice president, secretary-treasurer, recording secretary and three trustees. The margin of votes for the various officers was such that the Secretary of the Department of Labor chose to challenge the election of the president (decided by a 157 vote margin) and the third trustee (decided by an 83 vote margin). 3,972 out of approximately 8,200 members voted in the election.

Defendant challenges the authority of the Secretary to bring this suit on the grounds that the complaining union members failed to exhaust internal union remedies before complaining to the Department of Labor. Exhaustion of union remedies is a prerequisite to filing a complaint with the Secretary against the Union. 29 U.S.C. § 482(a)(1). Defendant asserts that the complaining members in this case failed to comply with union rules requiring a member who is aware of a problem concerning an election prior to the election to submit a written protest or charge to the local union secretary-treasurer within forty-eight hours of his knowledge of the event or problem of which he complains. Defendant contends that the complaining members' knowledge, prior to the election, that no mailed ballots would be used, combined with their knowledge that some members had residences substantial distances from the polling place required them to complain before the election that some members would be denied a reasonable opportunity to vote.

■ The record is clear that both Holland and Spicer were aware that the Local 41 membership included drivers who resided hundreds of miles from the polling place. The record is also clear, however, that before the election Holland and Spicer were not aware that there were members who lived substantial distances from Kansas City who did not work out of terminals or "barns" located in the Kansas City area. Holland and Spicer were not concerned about the distance and inconvenience incurred by over-the-road drivers who worked out of Kansas City. The underlying protest was based on the fact that there were members who lived and worked far enough away from Kansas City to deprive those members of a reasonable opportunity to vote in an election held in Kansas City. There is no claim that, once Holland and Spicer became aware of the extent and nature of the membership, they failed to comply with Union protest procedures. Had Holland and Spicer been provided with an adequate list of employees or employers, it is possible that they would have learned of the extent of the membership before the election, and this case could have been avoided. There was no failure to exhaust union remedies with regard to the complaint pertaining to members who lived and worked out of terminals substantial distances from Kansas City.

■ The Labor Management Reporting and Disclosure Act, 29 U.S.C. § 401 *et seq.*, provides that members of labor organizations shall have the right to vote for or otherwise support the candidates of their choice. 29 U.S.C. § 481(e). This statutory protection of the right to vote implies that a member must have a reasonable opportunity to vote. The statute does not purport to set up exact and rigorous requirements to be followed, but allows the unions a degree of discretion in the way their elections are to be run. The reviewing court must examine the voting arrangements actually employed in light of the particular circumstances of the local union and its membership to determine whether members have been given reasonable access to the exercise of their franchise. The ques-

tion is not whether better procedures could have been employed or whether the union could have made voting more convenient for some persons, but whether the arrangements made by the union are so lacking in democratic principles and are so unfair to the members affected, that the effect is to deny those persons a reasonable opportunity to vote. *Hodgson v. Local Union 582*, 350 F.Supp. 16, 19 (C.D.Cal.1972).

The evidence showed that the 1981 election was run in the same basic manner as Local 41's elections have been run for at least twenty-seven years. There was a single polling place at the union hall which was open for voting for five consecutive days, including a weekend, from 8:00 a.m. to 8:00 p.m. Having such a long open voting period was an attempt to give everyone an opportunity to vote.

The subject of mailed ballots was discussed by the incumbent administration. After conferring with counsel, it was decided to run the election as it had always been run to avoid the possibility of a challenge, and to avoid unnecessary expense. When this procedure was proposed at a meeting of the candidates, no objection was made. At no time before or during the election did any member or candidate request that mailed ballots be used. There was no evidence of bad faith in the administrative decision not to propose the use of mailed ballots. The lack of bad faith, however, is not determinative of whether the members were afforded a reasonable opportunity to vote.

Whether particular members were given a reasonable opportunity to vote must be determined in light of the circumstances of the local union and its membership prevailing at the time of the challenged election. A union cannot presume that voting procedures used without challenge in the past will be immune to attack. The procedures may have been deficient all along without complaint, or the circumstances of the membership may have changed. The LMRDA imposes an affirmative duty on the union to insure that its membership is afforded a reasonable opportunity to vote.

At the time of the election, Local 41 had members working out of terminals in Jefferson City, Joplin, Miller, and Springfield, Missouri, and Sedgwick and Phillipsburg, Kansas. The distances from these places to Kansas City surprisingly has been the subject of some controversy in this case. Because plaintiff used a cut-off point of 148 miles in calculating the number of persons who allegedly were denied a reasonable opportunity to vote, defendant has complained that precise measurements may not have been made. Any difference between actual highway miles and miles calculated by using an official highway map will not be determinative. There is no magic to the Government's choice of 148 miles as a cut-off for purposes of presentation of its case. The question is whether, under all of the circumstances, members were given a reasonable opportunity to vote.

At the time of the election, 115 members of Local 41 were employed at the United Parcel Service terminals in Joplin and Springfield. All of these workers fell under a union security agreement that required them either to pay fees equal to membership dues or to become and remain members in good standing with Local 41. None of these employees ever came to Kansas City as part of a regular job assignment. While not all of these employees lived within the city limits of Joplin or Springfield, a review of the list of employee addresses indicates that none of these employees lived within a 110 mile radius of Kansas City.[1]

United Parcel Service is a package delivery business, with the busiest time of the year for its employees being the period just before Christmas, December 25. During the pre-Christmas season UPS employees work many overtime hours and would find

---

1. The Court was unable to determine from the exhibits the distance to the residence of the

employee who lived in Brookline, Missouri.

it nearly impossible to get permission from UPS management to take a day off with or without pay to vote. In order to have voted in this election, these employees, on their own, limited free time, would have had to make a 5–7 hour trip to Kansas City at their own expense. While there was no evidence of the actual weather and driving conditions prevailing at the time of the election, there was evidence that travel conditions are generally more likely to be more hazardous and less predictable during December in Kansas City than at other times of the year. Not one of the 115 Joplin or Springfield members voted in the election.

At the time of the election, KAW Transport had terminals in Jefferson City, Belle and Miller, Missouri, and Sedgwick and Phillipsburg, Kansas. The drivers working out of Jefferson City hauled bulk asphalt and petroleum products mostly around the Jefferson City area and the resort area around the Lake of the Ozarks. The Belle drivers hauled southeast of Jefferson City, and occasionally into St. Louis. The Miller drivers hauled within the southern portion of Missouri. Drivers out of the Sedgwick terminal delivered to 48 states. Phillipsburg drivers' runs included the northwest part of Kansas with an occasional run to the Kansas City area. None of these drivers were dispatched out of Kansas City. Other employees at these terminals were shop employees who didn't ordinarily travel at all. The drivers who on occasion came to the Kansas City area did so to load petroleum products and return to their destination. While here they had no authority to use company trucks for personal business or to vote in a union election, and the union does not claim that any particular employee should have done so. Their work day was assigned so they had enough time to perform their work and get back to their base terminal, but no more than that. There is no claim that the company should have provided transportation to the voting site for any drivers whose trucks were being loaded or unloaded.

Eight employees worked out of or at the Jefferson City terminal more than 146 miles from Kansas City. None of the Jefferson City employees lived less than 115 miles from Kansas City. Three employees worked out of and lived in Belle, more than 165 miles from Kansas City. The Miller terminal, over 150 miles from Kansas City, was base for 13 employees, none of whom lived any closer to Kansas City than 150 miles. Sedgwick, Kansas, is more than 170 miles from Kansas City. The twenty-five Sedgwick members lived no closer to Kansas City than 140 miles. Finally, Phillipsburg, Kansas, is over 250 miles from Kansas City. Four employees worked out of this location, none of whom lived closer to Kansas City than 250 miles.

The considerations for these employees are slightly different from those for the UPS employees. There was no evidence that their work picked up during the Christmas season. Also, although some Kaw employees ordinarily never left the shop, most were truck drivers who were accustomed to driving relatively long distances. Defendant argues that because driving great distances is not unusual in the trucking industry, the 300 or so mile journey to vote should not be viewed as a substantial hinderance. While it is true that a trucker who drives thousands of miles weekly may in the abstract be less likely to be inhibited by a 300 mile trip than a truck loader who never leaves the terminal, the Court does not equate driving as part of one's job on company time and expense to driving on one's own limited free time during the holiday season and paying for the expenses. There was no evidence that any of the drivers thought 300 miles round trip was not a long way to drive solely in order to vote. Not one of these fifty-three members voted in the election.

Defendant requests that this Court find the use of absentee ballots creates special expense and administrative burdens to the extent that such ballots should be disfavored and to show that failure to provide mailed ballots was reasonable. The issue in this case, however, is whether members had a reasonable opportunity to vote, not whether the union was reasonable in set-

ting the election procedures and not providing for mailed ballots. Although there may be some overlap of these issues, the questions are not necessarily identical. Availability of a reasonable alternative means of voting is certainly relevant to the question of whether members had a reasonable opportunity to vote, but a mailed ballot is not the only way to allow outlying members to vote. The evidence indicated that at least on one occasion (not involving an election of officers), Local 41 used multiple polling places. The use of multiple polling places is also referred to in 29 C.F.R. § 452.94. In any event, the evidence showed that while mailed balloting requires arrangements different from manual balloting, the procedure does not cause administrative problems particularly greater than a manual ballot. More than 50% of the unions in this region use some form of mailed ballots with no more problems (and perhaps significantly fewer problems) than with manual ballots.

In *Donovan v. Plumbers Local 725*, 112 LRRM 3357 (S.D.Fla.1982), the district court found that a line drawn at 110 miles was unrealistic in the building trades, and that the union's choice to refuse a mailed ballot when only 11 percent of the union membership were outside the union's geographic jurisdiction did not deprive the members of a reasonable opportunity to vote. That case involved workers who were on "travel cards" and working outside of the normal jurisdiction of the local. The policy of the union was to deny a mailed ballot unless more than 25% of its membership was working outside of the normal boundaries. The court specifically distinguished the case in which the union's jurisdiction covered a membership that was "widely dispersed." *Id.* at 3373. The court found that the union's jurisdiction, covering a three county area was not "widely dispersed." The members who were working outside of the jurisdiction on travel card status were found to be doing so voluntarily.

In the case at bar the members in question were not on travel card status, or working outside of the normal area covered by Local 41's jurisdiction. The members were not outside the union's jurisdiction temporarily or under special circumstances. The question is not how the union should treat special unusual circumstances, but what opportunity to vote must be afforded to members living and working in their normal working area. The number of members claimed by the Secretary to have been living more than 148 miles from Kansas City is less than 5% of the total membership. The number of members considered above is less than 2.5%. Nonetheless, a union cannot disenfranchise an isolated group of members merely because their votes do not constitute a significant percentage of the membership.

The case at bar is also distinguishable from *Hodgson v. Local 582*, 350 F.Supp. 16 (D.C.Cal.1972). In that case the challenge arose in an election decided by very small margins (2–249 votes). Once again the election was challenged on the basis of members voluntarily on travel card status or members who had retired and voluntarily moved away. In that context the court found refusal to provide a mailed ballot not to deny the members a reasonable opportunity to vote. The court concluded that within

> the membership of any sizeable local union, or any given date, there will be many persons who cannot "conveniently" come in person to vote. Some will be on vacation, some will be ill, some will be out of the jurisdiction on necessary family and personal business, some will be at work at sites far away from the polling place. For the Court to accede to the Secretary's argument and require absentee voting arrangements for all union elections where the electorate is sizeable in number, would be judicial legislation and outside the proper scope of review . . . .

350 F.Supp. at 19–20. The Court found that a travel card or retired member choosing to live at a distance from the union local, assumes the risk of finding it expensive or inconvenient to come back home to vote at a union election. Here the mem-

bers in question had no special circumstances making it more difficult for them to vote than for the other members. Their work places were not special circumstances, but constant factors to be taken into consideration in setting the election procedures. The members cannot be said to have assumed the risk of having a distant local. Under the Union's security agreement, payment of dues to Local 41 was a condition of continued employment.

Defendant urges the Court to find that the members' failure to vote was not due primarily to the distance required to be driven to work. Evidence was presented that some of the members didn't vote because they didn't care about the election, or because they didn't know who was running. The Court is unwilling to discount the effect of distance on these members' reasons for not voting. The fact that some members no longer care about elections does not diminish the fact that they may have been deprived of a reasonable opportunity to vote. These members' votes were not actively solicited either because of the candidate's lack of information concerning these members or because the candidates knew that few, if any, would make the trip to vote. With little or no campaign information being distributed to the outlying areas it is not surprising to find widespread apathy with regard to a particular election. The Court will not discount disenfranchisement merely because it has progressed to the point that the party disenfranchised no longer cares.

■ After considering all of the evidence and exhibits concerning the circumstances surrounding the election, the Court finds as a matter of fact, that the 168 members of Local 41 considered above did not have a reasonable opportunity to vote in Local 41's December, 1981, election in violation of 29 U.S.C. § 481, and that such violation may have affected the outcome of the election. Evidence was presented by the Secretary concerning other employers located substantial distances from Kansas City. In light of the challenge and the margin of votes in the election, the Court finds it unnecessary to determine whether all employees of such employers were deprived of a reasonable opportunity to vote. The Court makes no "bright line finding" concerning a minimum or maximum distance to the polls that might constitute an unreasonable obstacle. The Court's finding, rather than being based on a strict mileage limitation, is based on a consideration of all of the circumstances of the union and its membership at the time of the election. The arrangements made by the union for those members to vote, although made in good faith, were so unfair and lacking in democratic principles that the effect was to deny 168 members a reasonable opportunity to vote.

In *Wirtz v. Local Union 169*, 246 F.Supp. 741 (D.Nev.1965), the district court found that where only eleven and one-half percent of the members of the local had mailing addresses more than eighty miles from the polling place, a reasonable opportunity to vote was given. This case is distinguishable in several respects. Of course, the minimum distance considered was less than this opinion contemplates, but more importantly, the judge noted that the members in Nevada could choose to join or not to join the Union under the state's "Right to work" statute. *Id.* at 753. In the case at bar all of the members considered fell under a union security agreement. Furthermore, the judge found there to be sound reasons why personal appearance at the polls may be preferred to a mail ballot in the protection of the secrecy of the ballot and that the expense and complications of multiple polls might offset benefits. In the case at bar, the evidence showed that in a properly-run mailed ballot secrecy is no more of a problem than in a manual ballot. There was no evidence in the case at bar that complications involved in multiple polling places would render such a procedure prohibitive.

Today's decision is not in conflict with *Secretary of Labor v. Local 576*, 701 F.2d 180 (6th Cir.1982), wherein the circuit court affirmed the district court's grant of summary judgment in favor of the union where

all facts were stipulated. In that case the Secretary's argument was essentially that as a matter of law, a polling place more than 100 miles away from some members deprives those members of a reasonable opportunity to vote. Today's decision does not rest merely on the distance factor alone, although it is a strong factor. The nature of the work, the nature and extent of the union, the voting methods available to be used by the union, the method actually used, the time of year of the election, and all circumstances surrounding the election were considered in reaching the Court's conclusion. In fact, this Court tacitly agreed with the Sixth Circuit's opinion that the distance alone did not, *ipso facto*, require an alternative method of voting when it denied the Secretary's motion for summary judgment.

A regular election is due to be held next month. The Secretary has indicated that he does not wish to put the Union to the expense of a separate election if this can be avoided. It may not be possible to include the supervised race in the upcoming regularly scheduled election. This opinion and order contemplates that the consolidation will be possible. The parties will have three days from the date of this order to inform the Court that such a course is impossible and seek amendment of this order.

Accordingly:

1. The 1981 elections of the President and Third Trustee are hereby declared to be void. It is hereby *ordered* that a new election for these offices be conducted under the supervision of the Secretary, and so far as lawful and practicable, in conformity with the constitution and Bylaws of defendant. The supervised election shall take place concurrently with the upcoming regularly scheduled election.

2. The persons elected shall take the oath of office and be installed in office as soon as practicable after results of the election have been certified by the Judges of Election. Such officers shall serve until the installation of new officers pursuant to the next regularly scheduled election to be held by defendant.

3. All decisions as to the interpretation or application of Title IV of the Act, and the Constitution and Bylaws of defendant and the Constitution of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, relating to the supervised election are to be determined by the plaintiff, and his decisions shall be final.

4. This action will be maintained on the docket of the Court pending completion of the election, after which plaintiff shall certify to the Court the names of the persons elected and that such election was conducted in accordance with Title IV of the Act, and, insofar as lawful and practicable, in accordance with the provisions of the Constitution and Bylaws of defendant and the Constitution of the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America. Upon approval of such certification, the Court will enter an order declaring that such persons have been elected as shown by such certification, and dismissing the action.